**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ROBERT FEENEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>-against-<br><br>IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, and FRANCIS T. JOYCE<br><br>Defendants. | **Case No. 06-CV-6449**<br><br>**"ECF CASE"**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAW**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, by his attorneys, for his Class Action Complaint alleges:

## NATURE OF THE CASE

1. This is a Class Action brought on behalf of plaintiff and all other persons or entities, except for defendants, who purchased or otherwise acquired IMAX Corporation ("IMAX" or the "Company") securities on the Nasdaq National Market System ("Nasdaq"), (the "Class") during the period February 17, 2006 through August 9, 2006, inclusive (the "Class Period").

2. This action, based on violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), arises out of a series of false and misleading statements and omissions of material fact by defendants regarding IMAX's financial results.

## JURISDICTION AND VENUE

3. This action arises under sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a); and Rule 10b-5 promulgated pursuant to section 10(b) by the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5. The jurisdiction of this Court is based on section 27 of the Exchange Act, 15 U.S.C. § 78aa; and on sections 1331 and 1337(a) of the Judicial Code,

28 U.S.C. §§ 1331, 1337(a).

4. Venue is proper in this District under section 27 of the Exchange Act, 15 U.S.C. § 78aa, and section 1391(b) of the Judicial Code, 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Pursuant to 28 U.S.C. § 1391(d), as an alien corporation, IMAX may properly be sued in any District in the United States, including the Southern District of New York. Thus, venue is proper in this District.

5. In connection with the acts and conduct alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

**PARTIES**

6. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff Robert Feeney purchased shares of IMAX stock at artificially inflated prices during the Class Period as set forth in the accompanying certification and has been damaged thereby.

7. Defendant IMAX is a Canadian corporation with its principal place of business located at 2525 Speakman Drive, Mississauga, Ontario, Canada, L5K 1B1.

8. Defendant Richard L. Gelfond was, at all relevant times, the Company's Co-Chairman and Co- Chief Executive Officer.

9. Defendant Bradley J. Wechsler was, at all relevant times, the Company's Co-Chairman and Co-Chief Executive Officer.

10. Defendant Francis T. Joyce was, at all relevant times, the Company's Chief Financial Officer.

11. Defendants Gelfond, Wechsler, and Joyce are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of IMAX's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with the copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

12. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all persons who purchased or otherwise acquired IMAX securities between February 17, 2006 through August 9, 2006, inclusive. Excluded from the Class are defendants; members of the immediate families of the Individual Defendants; any entity in which any defendant has or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any defendant.

13. As of August 18, 2006, over 40 million shares of common stock of IMAX were outstanding in an actively-traded and efficient market in which millions of shares were traded during

the Class Period. IMAX common stock is traded on the NASDAQ under the symbol "IMAX." The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff, and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class. Record owners and members of the Class may be identified from records maintained by IMAX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

14. Plaintiff's claims are typical of the claims of the members of the Class in that plaintiff and each Class member purchased securities of IMAX during the Class Period and sustained injury as a result.

15. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

16. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to seek redress individually for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

17. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class:

(a) Whether the federal securities laws were violated by defendants' acts as alleged

herein;

(b) Whether defendants acted wilfully or recklessly in omitting to state and misrepresenting material facts; and

(c) Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages.

**FACTS**

18. IMAX is one of the world's leading entertainment technology companies and the newest distribution window for Hollywood films.

19. The Class Period commences on February 17, 2006. At that time, IMAX announced that the Company expected to meet or exceed its full year 2005 financial guidance. Specifically, the Company stated:

> IMAX Corp. announced today that, reflecting the strong tone and momentum if its business, it expects to meet or exceed the full year 2005 guidance it provided investors of $0.35 to $0.38 in net earning per share on a fully diluted basis.
>
> During the fourth quarter the Company completed 14 theatre installations, which is a record for a single quarter, and consistent with the guidance the Company provided. As a result, the Company installed a total of 34 theatre systems for the full year versus 21 for 2004. The Company also expects to report revenues approximately in the guided range of $ 145 to $ 150 million for all of 2005.
>
> These results are based on preliminary financial data and subject to the final closing of the Company's books and records.
>
> "IMAX's momentum and growth potential is building," said IMAX Co- Chairmen and Co- CEOs Richard L. Gelfond and Bradley J. Wechsler. "IMAX set aggressive goals for theatre signings, film performance, installations and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the

> most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues."
>
> IMAX also announced that in addition to completing 14 theatre installations, the Company signed for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40- 45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.
>
> "In addition to delivering on our financial and operational goals, we continue to deliver on our strategy of positioning IMAX as a profitable release window for Hollywood films, providing the Company with a strong platform from which to fulfill its long term potential," Gelfond and Wechsler Continued. "We are very excited to enter 2006 with our strongest film slate ever, with five IMAX DMR ®) titles already secured for day and date release, and Deep Sea 3D set for release in March. With the probable addition of another title in the fourth quarter of 2006 we expect to have a film release every six to eight weeks in 2006, which, we believe, should be a major factor in driving theatre sales as well as recurring revenues."
>
> IMAX will release its fourth quarter and 2005 full year financial results pre-market on Thursday, March 9, 2006.

20. On March 9, 2006, IMAX announced financial results for the year ended December 31, 2005. The Company reported that it had exceeded guidance and expectations for 2005, with net earnings of $0.40 per share, versus guidance of $0.35-$0.38 per share. The Company's 2005 net earnings represented a 62 percent increase when compared to earnings of $0.26 per diluted share reported for the year ended December 31, 2004. Commenting on these results, defendants Gelfond and Wechsler stated:

> Our 2005 results clearly reflect that IMAX's commercial strategy is working and that the momentum in our business is continuing to grow. We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of IMAX as a commercial destination for mainstream entertainment. We believe our steadily improving financial performance shows that our

> strategy and The IMAX Experience have been embraced by consumers, major studios and leading film exhibitors around the world.

21. Also on March 9, 2006, IMAX filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by Individual Defendants and reaffirmed the Company's previously announced financial results. The Company's Form 10-K also contained the following Sarbanes- Oxley required certifications signed by the Individual Defendants:

> 1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;
>
> 2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, result of operations and cash flow of the registrant as of, and for, the periods presented in this annual report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of

financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation; and

(d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

***

**SECTION 906 CERTIFICATION**

The Annual Report on Form 10- K for the fiscal year ended December 31, 2005 (the "Form 10-K) of the Company fully complies with the requirements of section 13(a) or 15 (d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

22. On March 9, 2006, IMAX also announced that the Company would explore "strategic alternatives to enhance shareholders value," including the potential sale or merger of the Company. Specifically, the Company stated:

> IMAX Corporation today announced that its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholders value, including, but not limited to, the sale or merger of the business with another entity offering strategic opportunities for growth. The company has retained Allen & Company and UBS Investment Bank as financial advisors in this process.
>
> "In order to fully realize the growth potential inherent in both the IMAX brand and the business we have built to date, we are evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling growth opportunities, makes this an ideal time to explore our options," said IMAX Co- Chairmen and Co- Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler.
>
> In making the announcement, IMAX stated that there can be no assurance that the exploration of strategic alternatives will result in a transaction. The Company does not currently intend to disclose developments with respect to the exploration of strategic alternatives unless and until its Board of Directors has approved a specific transaction.

23. On May 9, 2006, IMAX announced financial results for the first quarter of 2006 ended March 31, 2006. The Company reported a net loss of $0.14 per diluted share for the quarter, compared to net earnings of $0.03 per diluted share reported for the three months ended March 31, 2005. Commenting on these results, defendants Gelfond and Wechsler stated:

> We are pleased that we remain on track to grow IMAX's signings and installations- the two most important metrics of our growth- in 2006 above our exceptionally strong 2005 result. Given our solid film slate and the large amount of interest we are seeing from commercial exhibitors, we believe the Company will benefit from significant

> momentum as we look to the remainder of the year. First quarter earnings were below guidance of approximately a ten cent loss due to a number of factors, including the underperformance of V for Vendetta, which reduced earnings by two cents, the increase in non-cash compensation related to the increase in stock price after the Company's announcement of its explorations of strategic alternatives including the potential sale of the Company, which reduced earnings by one cent, as well as other non- cash expenses relating to this sale process incurred in the quarter. That said, we continued to make progress executing our core growth initiatives and implementing our commercial strategy during the first quarter. We remain optimistic that we will continue to improve upon our 2005 performance, where all of the Company's key metrics were up solidly.

24. Additionally, and with respect to the potential sale or merger of IMAX, defendants Gelfond and Wechsler stated:

> We have been very pleased with the amount of interest we have seen to date and how the process is proceeding to date. We just entered the second round and are pleased to be evaluating proposals from a broad range of interested parties. We remain confident that pursuing strategic alternatives for the business will enable us to expand the company's scale, accelerate its growth and enhance shareholder value.

25. Also on May 9, 2006, IMAX filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Joyce and reaffirmed the Company's previously announced financial results. With respect to the presentation to its financial results, the Company stated: "In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations."

26. Additionally, the Company's Form 10-Q contained the following Sarbanes-Oxley required certification signed by the Individual Defendants"

> 1. I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared.

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**SECTION 906 CERTIFICATION**

> The Quarterly Report on Form 10-Q for the quarter ended March 31, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly represents, in all material respects, the financial condition and results of operations of the Company.

27. On August 9, 2006, IMAX announced financial results for the second quarter of 2006, ended June 20, 2006. The Company reported net earnings of $0.08 per diluted share for the quarter ended June 30, 2006, compared to net earnings of $0.03 per diluted share reported for the three months ended June 30, 2005. Commenting on these results, defendants Gelfond and Wechsler stated: "We are pleased with our solid second quarter results, which reflect the ongoing success of our commercial strategy and the progress we are making executing our growth initiatives."

28. Additionally, and with respect the Company's potential sale or merger, the Company reported that while it received significant initial interest from multiple parties, the Company's view was that there were at that time no buyers who had indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remained from several parties as a lower valuation, however, the Company stated that its Board had authorized the Company's bankers to explore these opportunities, and that the process was ongoing. Commenting on the strategic alternative update, defendants Gelfond and Wechsler stated:

> While we are surprised that the high level of interest we initially saw has yet to result in a partnership or acquisition, we are committed to fully exploring all options open to the Company, including those offers that did not meet the Board's original valuation parameters.

> We remain committed to ensuring that any transaction is strategically or financially compelling and delivers the most value possible to our shareholders.

29. Also on August 9, 2006, IMAX filed its quarterly report with SEC on Form 10-Q. The Company's Form 10-Q was signed by defendant Joyce and reaffirmed the Company's previously announced financial results. Additionally, and with respect to the presentation of its financial results, the Company stated: "In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations." The Company's Form 10-Q also contained Sarbanes-Oxley required certifications signed by the Individual Defendants substantially similar to the certifications contained in ¶ 24, *supra.*

30. The statements contained in ¶¶ 18-29 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that defendants improperly timed revenue recognition from theatres; (2) specifically, that the Company recognized revenue in the fourth quarter of 2005 from at least ten theatres before the theatres had opened; (3) that the Company sought to manipulate its financial results because it desired to attract entities interested in buying or merging with the Company; (4) that the Company's financial statements were materially inflated; (5) that the Company lacked adequate internal controls; and (6) that the Company's financial statements were presented in violation of GAAP.

31. On August 9, 2006, after the market closed, IMAX shocked investors when the Company announced that it was in the process of responding to an informal inquiry from the SEC regarding the Company's timing of revenue recognition, including its application of multiple element

arrangement accounting in its revenue recognition for theatre systems. Specifically, the Company stated:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCooper LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.

32. On this news, shares of IMAX plummeted $3.90, or 40.5 percent, to close, on August 10, 2006, at $5.73 per share, on unusually heavy trading volume.

33. On August 21, 2006, IMAX announced that the Company's CFO, Individual Defendant Frank Joyce, stepped down from that position.

34. These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the

Company's improper accounting for and disclosure about its revenues, in violation of GAAP and SEC rules.

35. GAAP are those principles recognized by the accounting professions as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.401(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.401(a)(1)

36. Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a) The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b) The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e) The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79);

(f) The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB) Statement of Concepts No. 2, ¶ ¶58-59); and

(g) The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

37. The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

**SCIENTER ALLEGATIONS**

38. As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding IMAX their control over, and/or receipt and/or modification of IMAX's

allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning IMAX, participated in the fraudulent scheme alleged herein.

**COUNT I**

**PURSUANT TO SECTION 10(b)**
**OF THE EXCHANGE ACT AND**
**RULE 10b-5 PROMULGATED THEREUNDER**
**(Against All Defendants)**

39. Plaintiff incorporates by reference the allegations of paragraphs 1 through 38 as if fully set forth herein.

40. The reported financial results of IMAX were materially false and misleading, and defendants knew or were reckless in not knowing they were so, because defendants prepared and participated in the issuance of the deceptive and materially false and misleading statements to the investing public, as set forth above.

41. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct in an effort to maintain artificially high market prices for IMAX securities in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

42. As a result of the dissemination of the aforesaid false and misleading reports and releases, the market price of the securities of IMAX throughout the Class Period was higher than it would have been had the true facts concerning the Company's financial condition been known by the market.

43. In ignorance of the artificially high market prices of IMAX's publicly traded securities, and relying upon the integrity of the market in which that stock was traded, Plaintiff and the other members of the Class acquired IMAX securities during the Class Period at artificially

inflated prices and were damaged thereby when they could not recover that inflation after the truth was revealed.

**COUNT II**

**PURSUANT TO SECTION 20(a)**
**OF THE EXCHANGE ACT**
**(Against the Individual Defendants)**

44. Plaintiff incorporates by reference the allegations of paragraphs 1 through 43 as if fully set forth herein.

45. This claim is asserted against the Individual Defendants and is based on section 20(a) of the Exchange Act. Individual Defendants acted as controlling persons of IMAX within the meaning of section 20(a) of the Exchange Act. By reason of their positions as officers and directors of IMAX and ownership of IMAX stock, Individual Defendants had the power and authority to cause or to prevent the wrongful conduct complained of herein and did exercise such power and authority.

46. By reason of the foregoing, Individual Defendants are liable jointly and severally with and to the same extent as IMAX for IMAX's violations of section 10(b) of the Exchange Act and Rule 10b-5.

**PRAYER FOR RELIEF**

**WHEREFORE,** plaintiff, on behalf of himself and the Class, prays for judgment as follows:

(a) Declaring this action to be a proper plaintiff class action maintainable pursuant to rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring plaintiff to be a proper representative of the Class.

(b) Awarding plaintiff and all of the other members of the Class damages in an amount to be proven at trial, together with prejudgment interest thereon;

(c) Awarding plaintiff the costs and expenses incurred in this action, including reasonable attorneys', accountants', and experts' fees; and

(d) Granting plaintiff and the other members of the Class such other and further relief as the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
August 25, 2006

**MURRAY, FRANK & SAILER LLP**

By:___________S/___________________
Brian P. Murray (BM-9954)
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

Attorneys for Plaintiff

## CERTIFICATION

I, Robert Feeney, do hereby certify that:

1. I have reviewed the complaint and have authorized its filing.

2. I purchased the securities of IMAX Corp. which are the subject of the complaint, *but not* at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 or Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995.

3. I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. In the three years prior to this certification, I have neither applied to serve nor served as a representative party on behalf of a class in an action brought under the federal securities laws.

5. During the Class Period, I engaged in the following transactions:

TRANSACTION INFORMATION

| BUY OR SELL | TRADE DATE | NO. OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| BUY | 3/23/06 | 500 | 10.32 |
| BUY | 4/18/06 | 500 | 10.00 |
| SELL | 8/10/06 | 1000 | 5.7018 |

6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class and my activities in the lawsuit, as ordered or approved by the Court.

7. Nothing herein shall be construed to be or constitute a waiver of my attorney-client privilege.

8. I certify under penalty of perjury that the foregoing is true and correct.

Executed on August 23 / 2006. Signature